Myron SHAIN, individually and on behalf of all others similarly situated, Plaintiffs,

v.

DUFF & PHELPS CREDIT RATING COMPANY, Defendant.

No. 94 Civ. 0721(WK)(AJP).

United States District Court, S.D. New York.

Jan. 16, 1996.

**576**

Daniel C. Girard, Girard & Green, San Francisco, CA, Plaintiffs' Liaison Counsel.

Joseph E. Coughlin, Lord Bissell & Brook, Chicago, IL, Fredric W. Yerman, Kaye Scholer Fierman Hays & Handler, New York City, for Defendant, and Defendants' Liaison Counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, Senior District Judge.

This is a proceeding arising from the alleged "Ponzi scheme" involving the securities of Towers Financial Corporation ("Towers"). It is related to In Re Towers Financial Corporation Noteholders Litigation 93 Civ. 0810(WK)(AJP), but not consolidated into that action. As such, we referred the action to Magistrate Judge Peck for all pretrial matters. The background facts about the alleged Ponzi scheme are more fully described in Magistrate Judge Peck's Report and Recommendation to this Court dated September 20, 1995.

The instant action was brought by plaintiff **Myron Shain** ("plaintiff"), a purchaser of $200,000 of Towers Notes, on behalf of himself and an alleged class of similarly situated purchasers, against defendant Duff & Phelps Credit Rating Company ("defendant"), a securities rating service. The complaint asserts federal securities law claims against defendant for alleged violations of Sections 12(1) and 12(2) of the Securities Act of 1933, and also asserts three pendent state law claims. Defendant moved to dismiss the complaint for failure to state a claim upon which relief can be granted, and for failure to plead fraud with particularity. In his Report and Recommendation dated December 12, 1995, Magistrate Judge Peck recommends that the federal securities law claims be dismissed with prejudice and that the state law claims be dismissed without prejudice. For the reasons that follow, we agree, and adopt the Magistrate Judge's Report and Recommendation in its entirety.

## BACKGROUND

The facts underlying the instant action are described in detail in the Report and Recommendation.

In brief, the complaint alleges that the defendant "actively foisted a uniform and consistent set of misrepresentations and omissions on the ... [purported] Class [of purchasers] via the [two] ... Brokers who reiterated them to, or relied on them for, the Class." (Complaint ¶ 11). Further, the complaint alleges that defendant knew that the false information would be provided by the two brokers to their clients, and intended that the purported class of purchasers would use and rely on this false information in purchasing or retaining Towers Notes. (Complaint ¶¶ 33, 35). Finally, in conclusory fashion, the complaint alleges that defendant

directly or indirectly caused and induced the plaintiff and the ... class to purchase Towers Notes. [Defendant] was fully and substantially involved in, and intended to

be fully and substantially involved in, the sales and marketing of the Notes.

(Complaint ¶ 40).

## DISCUSSION

Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*, imposes strict liability for rescission on those who offer or sell securities without complying with applicable statutory registration and prospectus requirements. *Pinter v. Dahl* (1988) 486 U.S. 622, 647, 108 S.Ct. 2063, 2079, 100 L.Ed.2d 658. Further, the Supreme Court has held that § 12 liability is "not limited to persons who pass title," id. at 643, 108 S.Ct. at 2076–77, but includes anyone "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Id. at 647, 108 S.Ct. at 2079.

In the instant case, plaintiff asserts that defendant "solicited" the sale of Towers Notes and is thus strictly liable under § 12. The plaintiff, however, does not allege that defendant directly "solicited" him, nor indeed that defendant ever had any direct communication with plaintiff about the Notes. Rather, plaintiff alleges that defendant "solicited" the sale of Towers Notes through the "Class Brokers."

The Magistrate Judge rejects plaintiff's theory of liability, finding that the fact that defendant provided information to two brokers who passed that information on to the plaintiff does not give rise to § 12 liability. As the Supreme Court noted in Pinter, liability cannot be imposed upon "those who merely assist in another's solicitation efforts." 486 U.S. at 651 n. 27, 108 S.Ct. at 2081. Moreover, the Magistrate Judge cites numerous district court cases in this Circuit that stand for the proposition that persons are not liable under § 12 for solicitation unless they directly or personally solicit the buyer.

Because we find the Magistrate Judge's review and analysis of relevant caselaw thorough, we adopt his conclusion that, absent an allegation that defendant had direct contact with plaintiff, defendant, as a matter of law, is not subject to § 12 liability.

Defendant has also moved for dismissal of plaintiff's pendent state law claims. When federal claims are dismissed before trial, the Supreme Court has stated that the district court ordinarily should decline the exercise of pendent jurisdiction over the state claims by dismissing the state claims without prejudice. *Carnegie–Mellon v. Cohill* (1988) 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720. The Magistrate Judge therefore recommends that we dismiss plaintiff's pendent state law claims without prejudice. Finding such a recommendation wholly reasonable, we direct the clerk to enter an order dismissing the federal securities law claims with prejudice, and dismissing the state law claims without prejudice.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

PECK, United States Magistrate Judge.

This purported class action is another of the proceedings arising from the alleged "Ponzi scheme" involving the securities of Towers Financial Corporation ("Towers"). The background facts about Towers and its alleged Ponzi scheme are more fully described in this Court's Report and Recommendation dated September 20, 1995 in *In re Towers Financial Corporation Noteholders Litigation,* 93 Civ. 0810 (WK)(AJP), 1995 WL 571888 (S.D.N.Y. Sept. 20, 1995), familiarity with which is assumed.[1] The present action is related to *In re Towers* but not consolidated into that action.

Plaintiff Myron Shain, who purchased $200,000 of Towers Notes brought this action on behalf of himself and an alleged class of similarly situated purchasers, against defendant Duff & Phelps Credit Rating Company ("Duff & Phelps"), a securities rating service. (Amended Complaint [hereafter, "complaint" or "Cplt."] ¶¶ 5, 6, 24.) Shain's complaint asserts federal securities law claims against Duff & Phelps for alleged violations of Sections 12(1) & 12(2) of the Securities Act of

---

**1.** Defined terms from the Court's *In re Towers* Report and Recommendation will be used herein.

1933, and also asserts three pendent state law claims. Presently before the Court is Duff & Phelps' motion to dismiss Shain's complaint for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity, pursuant to Rules 12(b) and 9(b) of the Federal Rules of Civil Procedure.

For the reasons set forth below, I recommend that the Court dismiss the federal securities law claims with prejudice and the state law claims without prejudice.

### THE COMPLAINT

On a motion to dismiss, the Court must accept the well-pleaded allegations in the complaint as true. *E.g., In re Towers*, 1995 WL 571888 at * 1, *citing Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Accordingly, this opinion will summarize Shain's complaint, without resorting to the phrase "plaintiff alleges."

Towers was engaged in a far-reaching "Ponzi scheme" designed to deceive purchasers of Towers Notes into believing Towers was a healthy and growing concern when it was failing on a massive scale and kept afloat only through using cash from subsequent Note offerings to make the interest payments on earlier Notes. (Cplt. ¶¶ 10–11, 15–22.)

On or about March 10, 1992 and August 24, 1992, Shain purchased $200,000 of the more than $215 million of Notes issued by Towers pursuant to five "private placement" Offering Memoranda. (Cplt. ¶¶ 5, 19.)

"The Duff & Phelps [proposed] Class is defined as all persons who purchased Notes from February 15, 1989 to the present ('Class Period') by or through broker-dealers Cooper Davis, located in Chicago, Illinois, and East–West Capital, located in Southfield, Michigan. (Cooper–Davis and East–West Capital are referred to as the 'Class Brokers')." (Cplt. ¶ 7.) There are at least 80 members of the proposed class, who purchased over $17 million of Towers Notes. (Cplt. ¶ 9.)

The gist of Shain's complaint is that "Duff & Phelps actively foisted a uniform and con-

sistent set of misrepresentations and omissions on the Duff & Phelps Class via the Class Brokers who reiterated them to, or relied on them for, the Class." (Cplt. ¶ 11.)

Beginning in or about July 1990, "in an effort to lend additional credibility and respectability to its operations, Towers hired Duff & Phelps to rate the Towers Bonds." (Cplt. ¶ 25.) Towers paid "substantial sums" to Duff & Phelps, "ostensibly for the investigatory and other 'due diligence' activities by Duff & Phelps that were a supposed precondition of a Duff & Phelps bond rating." (*Id.*) The relationship between Towers and Duff & Phelps, however, soon became "symbiotic":

> Towers paid Duff & Phelps fees and Duff & Phelps helped Towers promote itself to the investment community with Duff & Phelps' rating of the Bonds, the favorable "shadow rating"[2] of Towers, and other representations made to the Class Brokers.

(*Id.*)

The Towers Notes "were distributed via broker dealers." (Cplt. ¶ 26.) As part of Towers' efforts to market the Notes, beginning in or about June 1990, the broker-dealers began to communicate with Towers to learn more about Towers and to verify information regarding Towers' operations and financial background. (*Id.*) Towers referred the Class Brokers to Duff & Phelps, which Towers said "would provide independent verification and corroboration regarding the creditworthiness of Towers and its Notes, and confirm the positive statements Towers had made in its public SEC filings and otherwise." (*Id.*)

Duff & Phelps represented to the Class Brokers that it "had conducted extensive due diligence investigations prior to assigning ratings to the Towers Bonds and it was continuing to monitor the performance of the Bonds and Towers." (Cplt. ¶ 28.) Duff & Phelps' "actions in convincing the Class Brokers that their customers should buy the Notes were facilitated by Duff & Phelps' use of what Duff & Phelps termed a 'shadow rating' of Towers' company operations."

---

**2.** The complaint never describes what is meant    by the term "shadow rating."

(Cplt. ¶ 29.) While it "is not known [to plaintiff] at this time whether Duff & Phelps received direct cash payments or other monetary incentives for preparing and disseminating the shadow rating," Duff & Phelps did "reap substantial monetary, pecuniary and reputational benefits" as a result of its overall relationship with Towers. (*Id.*)

Between June 1990 and February 1993, "Mark Tuttle, Ernest Elsner and other employees and agents of Duff & Phelps" met in person and by telephone with the two Class Brokers, Cooper Davis and East–West Capital. (Cplt. ¶ 31.) During these meetings, Duff & Phelps represented that:

(1) its relationship with Towers gave it "unique insight into Towers' operations and performance";

(2) "it was performing and/or had performed exhaustive ongoing review of all aspects of Towers finances, operations and management";

(3) "it could assure the Class Brokers and their clients of the solid worth, integrity, stability and safety of the Notes";

(4) "its investigation of Towers showed that Towers' public representations were true and accurate";

(5) "the Towers Notes were highly secure";

(6) "there were [sic] no appreciable risk that Towers would default either as to interest or principal payments"; and

(7) "if Towers were to default there was adequate collateral to protect the Note investors' principal and interest."

(Cplt. ¶ 31.)

Throughout 1992, Duff & Phelps "consistently referenced" its non-public favorable shadow rating of Towers' senior debt, in order to "cause the Class Brokers to rely on Duff & Phelps assurances that Towers and the Notes were a sound investment." (Cplt. ¶ 32.) Duff & Phelps knew that the false information would be provided by the Class Brokers to their clients. (Cplt. ¶ 33.) "At all times Duff & Phelps knew that the false assurances and information it was providing would be, and were being, used by the Class Brokers and their clients, the members of the Class, to evaluate whether to purchase and/or maintain investments in Towers Notes. Duff & Phelps intended that the Duff & Phelps Class Note investors use and rely on the information Duff & Phelps was providing in purchasing or retaining Towers Notes." (Cplt. ¶ 35.)

Shain alleges that Duff & Phelps violated Sections 12(1) and 12(2) of the Securities Act of 1933 (Counts I & II). With respect to section 12, the complaint alleges that "Plaintiff and the Class communicated with Duff & Phelps through the Class Brokers." (Cplt. ¶ 39.) In conclusory fashion, the complaint further alleges that

Duff & Phelps directly or indirectly, caused and induced the Plaintiff and the Duff & Phelps Class to purchase Towers Notes. Duff & Phelps was fully and substantially involved in, and intended to be fully and substantially involved in, the sales and marketing of the Notes. Duff & Phelps solicited the Class' purchase of the Notes for Duff & Phelps' financial gain, as described more fully above. Duff & Phelps did not merely assist in Towers' solicitation efforts.

(Cplt. ¶ 40.)

The complaint also asserts claims under the Illinois Consumer Fraud Act (Count IV), the Illinois and other state Blue Sky laws (Count V), and for common law negligent misrepresentation (Count III).

### *ANALYSIS*

**I. *BECAUSE THE COMPLAINT DOES NOT ALLEGE THAT DUFF & PHELPS DIRECTLY SOLICITED PLAINTIFF'S PURCHASE, THE § 12 CLAIMS SHOULD BE DISMISSED***

**A. *The Supreme Court's Pinter v. Dahl Decision***

Section 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*, provides that:

Any person who—(1) offers or sells a security in violation of section 77e of this title [prohibiting the sale of unregistered securities], or (2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a mate-

rial fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security from him [for rescission or rescission-based damages].

Section 12(1) imposes strict liability for rescission on those who offer or sell securities without complying with applicable statutory registration and prospectus requirements. *See Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 2078, 100 L.Ed.2d 658 (1988).

The Supreme Court defined the boundaries of a "statutory seller" under § 12(1) in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The Second Circuit regards the "offers or sells" language in subsections 12(1) and 12(2) as identical in meaning and accordingly applies the *Pinter* analysis to § 12(2) claims also. *E.g., Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989).

The *Pinter* Court held that "[a]t the very least, ... the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity. Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value." 486 U.S. at 642, 108 S.Ct. at 2076.

The Court further noted, however, that both in "common parlance" and under the securities laws, "a person may offer or sell property without necessarily being the person who transfers title" to it. *Id.* Thus, the Supreme Court held that § 12 liability "is not limited to persons who pass title," but includes "an individual who engages in solicitation, an activity not inherently confined to the actual owner." 486 U.S. at 643, 108 S.Ct. at 2076. "A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase." 486 U.S. at 644, 108 S.Ct. at 2077. The Supreme Court recognized that "brokers and others who solicit securities purchases" are "statutory sellers" for § 12 liability purposes in situations where "a broker acting as agent of one of the principals to the transaction successfully solicits a purchase." *Id.* at 646, 108 S.Ct. at 2078. Applying § 12 to brokers and similar solicitors "furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities.... The solicitation of a buyer is perhaps the most critical stage of the selling transaction. It is the first stage of a traditional securities sale to involve the buyer...." 486 U.S. at 646, 108 S.Ct. at 2078.

The Supreme Court, however, limited the definition of "solicitation" by holding that:

Although we conclude that Congress intended § 12(1) liability to extend to those who solicit securities purchases, we share the Court of Appeals' conclusion that Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer. When a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer "purchased" from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as "soliciting."

486 U.S. at 647, 108 S.Ct. at 2078. Instead, "liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.*

Moreover, the Court in *Pinter* rejected the "substantial factor" test adopted by the Fifth Circuit in which a person " 'whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place' " was found liable under § 12. 486 U.S. at 648–54, 108 S.Ct. at 2079–82. The Supreme Court found that:

There is no support in the statutory language or legislative history for expansion of § 12(1) primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers. Indeed § 12's failure to impose express liability for mere participation in wrongful sales transactions suggests that Congress did not intend that the section impose liability on participants' collateral to the offer or sale.

486 U.S. at 650, 108 S.Ct. at 2080. Noting that "the 'party to a solicitation' concept could easily embrace those who merely assist in another's solicitation efforts," the Supreme Court therefore rejected the "suggestion that persons who 'participate in soliciting the purchase' may be liable as statutory sellers" under § 12. 486 U.S. at 651 n. 27, 108 S.Ct. at 2081 n. 27.

### B. *Duff & Phelps' "Solicitation" of the Brokers But Not the Plaintiff Does Not Give Rise to Liability Under Section 12*

■ Duff & Phelps is not alleged to be the "owner" of the Notes that "passed title . . . to the buyer for value." Rather, Shain asserts that Duff & Phelps is liable as one who "solicited" the sale of the Notes. (Plaintiff's Memorandum in Opposition to Defendant Duff & Phelps' Motion to Dismiss, dated January 13, 1995 ["Plf's Brief"], at 5.)

Shain, however, does not allege that Duff & Phelps ever directly "solicited" him, or indeed that he ever had any direct communication, oral or written, with Duff & Phelps about the Towers Notes. Rather, Shain alleges that "Duff & Phelps 'solicited' the sales of Towers Notes to the Plaintiff *through the Class Brokers.*" (*Id.,* emphasis added; *see also, e.g.,* Cplt. ¶¶ 7, 20, 26.) Specifically, Shain admits that

> Here, although *Plaintiff does not dispute that Duff & Phelps did not make the false oral communications to him or class members in person,* there is no such "in person" requirement. Duff & Phelps knew that the statements it made to the Class Brokers were statements that would be passed directly to the Class members and would influence their decision to purchase the Notes.

(Plf's Brief at 13, emphasis added.)

The Court finds, however, that Shain's theory that Duff & Phelps "solicited" (or provided information to) two brokers who passed that information on to plaintiff, does not give rise to § 12 liability. As noted above, in *Pinter* the Supreme Court held that Section 12 liability cannot be imposed upon "those who merely assist in another's solicitation efforts." 486 U.S. at 651 n. 27, 108 S.Ct. at 2081 n. 27. Moreover, the district court decisions in this circuit consistently have held that persons are not liable under § 12 for solicitation unless they directly or personally solicit the buyer. *See, e.g., Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co.,* 794 F.Supp. 1265, 1283–85 (S.D.N.Y.1992) (liability should not be extended beyond those who "actively solicit offers to buy securities"); *Mabon, Nugent & Co. v. Borey,* 127 B.R. 727, 734–35 (S.D.N.Y.1991) (members of company's board of directors who authorized securities sales but did not solicit sales are "quintessentially collateral participants" who are not liable under § 12; without passing title to the purchaser, or offering to sell the security, or soliciting the sale motivated in part by a desire to serve his own or the owner's financial interests, "substantial participation in causing the sale to take place . . . is insufficient" to cause § 12 liability); *In re Gas Reclamation, Inc. Sec. Litig.,* 733 F.Supp. 713, 723–24 (S.D.N.Y.1990) (no § 12 liability where defendant did not have "direct contact" or "personally solicit" plaintiff or other investors); *HB Holdings Corp. v. Scovill, Inc.,* 88 Civ. 7983, 1990 WL 37869 at * 5 (S.D.N.Y. March 26, 1990) (no liability where defendants assisted seller in stock sale but "were not involved in the actual sale and did not negotiate or in any way solicit this sale on behalf of [seller]"); *Sellin v. Rx Plus, Inc.,* 730 F.Supp. 1289, 1292 (S.D.N.Y.1990) (no § 12(2) liability for lawyer who prepared allegedly misleading private placement memorandum but did not solicit sales; "To be held liable under § 12, a person must have been involved in the actual solicitation of sales, and have done so with the express motive of making a profit from any successful sales."); *see also, Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016–17 (2d Cir.1989) (no § 12 liability for attorney who was also director and member of executive committee of seller but who did not initiate or negotiate sale, and thus did not "solicit" sale).

Shain disputes that direct or personal contact with the purchasers is necessary, citing *Capri v. Murphy,* 856 F.2d 473 (2d Cir.1988). In *Capri,* investors in a coal mining venture sued general partners of the venture under state and federal securities law. The Court

found that two general partner defendants who had "prepared and circulated the prospectus to plaintiffs" but had never actually met with the purchasers were liable under § 12 as "sellers". 856 F.2d at 478. The Court based this finding of liability upon the facts that while Fain, a lawyer and partner in the venture, had the only direct communication with the plaintiffs, his efforts were done "at the behest" of the two defendants and that Fain "took no action in relation to the investors other than that which was contemplated and authorized by [the two general partner] defendants." *Id.* Given these factors, the Court found that Fain's solicitation efforts were "directly attributable" to the two general partner defendants, and thus both were liable under § 12(2).

*Capri* is distinguishable from the instant case. First, Shain has not alleged that Duff & Phelps created, drafted, distributed or had anything to do with Tower's Offering Memoranda. *See Mabon v. Borey*, 127 B.R. at 735 (distinguishing *Capri* on ground that "the defendants found in *Capri* to have been sellers within the meaning of § 12(2) were the general partners of the seller who prepared and circulated the fraudulent prospectus to the purchasers."). Furthermore, while in *Capri* the person who directly solicited the investors was found to be under the control of the two general partner defendants, Shain does not allege that the Class Brokers who directly solicited Shain were under Duff & Phelps' control. In the absence of these factors, *Capri*'s exception to the direct solicitation requirement is inappropriate in the case before this Court.

Moreover, *Capri*'s holding with respect to a different defendant, LCG, implicitly supports our interpretation. In discussing LCG's liability, the Court stated that merely alleging that LCG "played a major role" in setting up the venture is insufficient to cast that defendant as a "seller" for § 12 liability purposes. "Instead, plaintiffs must show that LCG *actually solicited* their investment." *Capri*, 856 F.2d at 479. This language in *Capri* suggests that the Court shared this Court's view that solicitation requires direct and personal contact, or control

over and direction of the person who makes the direct solicitation.

The recent decision in *Carr v. Equistar Offshore Ltd.*, 94 Civ. 5567, 1995 WL 562178 at *13 (S.D.N.Y. Sept. 21, 1995), similarly interpreted *Capri* as being dependent on the defendant's control of the actual solicitor:

> [Th]ose persons who have not directly solicited the investor may be held liable under Section 12 if they have actively participated in the preparation and circulation of the prospectus ... and the prospectus was used in the course of soliciting the investor, or if those persons have directed the actions of the person who directly solicits the purchaser, *Capri v. Murphy*, 856 F.2d · 473, 478 (2d Cir.1988).

The recent decision in *Endo v. Albertine*, 88 C 1815, 1995 WL 170030 (N.D.Ill. April 7, 1995), further illustrates the principle that indirect aid in solicitation is insufficient for purposes of § 12 liability. In *Endo*, plaintiff purchasers of Fruit of the Loom ("FOL") securities filed a § 12 action against FOL's directors and officers. The defendants did not directly sell shares to plaintiffs or solicit them to buy shares, but did participate in "road show" presentations for the purpose of soliciting institutional investors to purchase FOL securities. The Court held that "plaintiffs have failed to state a § 12(2) claim against the FOL defendants because plaintiffs have presented no evidence indicating that the FOL defendants solicited any of the plaintiffs ... or even had any contact with these plaintiffs. Absent direct contact of any kind between the FOL defendants and the plaintiff-purchasers, the court finds that as a matter of law the defendants are not sellers under § 12(2)." 1995 WL 170030 at *3 (*citing, inter alia, In re Gas Reclamation, Inc. Sec. Litig.*, 733 F.Supp. 713, 723–24 (S.D.N.Y. 1990) (discussed below)).

In *In re Gas Reclamation*, relied upon by the *Endo* court, the Court held that an issuer's agent who had no direct contact with the investors could not be liable under § 12 for solicitation. The Court ruled that "[e]ach investor ... must prove that [the defendant] personally solicited him or her." 733 F.Supp. at 723. Although the defendant reviewed drafts of the Offering Memoranda,

proposed revisions of the drafts and even gave advice to two investors by telephone, the Court held that there was "no evidence of direct contact between [the defendant] and any of the investors" and therefore found no § 12 liability. *Id.* at 723–24. The Court instructed that for purposes of § 12 liability, the focus should be on " 'the defendant's relationship with the plaintiff-purchaser' rather than the 'defendants' degree of involvement in the security transaction and its surrounding circumstances.' " *Id.* (*quoting Pinter v. Dahl,* 486 U.S. at 651, 108 S.Ct. at 2081). *See also, e.g., In re Newbridge Networks Sec. Litig.,* 767 F.Supp. 275, 281 (D.D.C.1991) (no § 12(2) liability for defendants where plaintiffs purchased securities not from defendants but from defendants' underwriters; solicitation or sale "through intermediaries" not sufficient; "absent any allegation of direct contact of any kind between defendants and plaintiff-purchasers, the Court rules as a matter of law that defendants are not statutory sellers."); *HB Holdings Corp. v. Scovill Inc.,* 1990 WL 37869 at *5 ("The statute only covers those who sell or solicit the sale of securities, and indirect aid, no matter how substantial, does not amount to a solicitation.").

Finally, plaintiff Shain argues that the allegation in the complaint that Duff & Phelps solicited sales "for financial gain" suffices under *Pinter* to satisfy § 12. (Plf's Brief at 8–12, *citing* Cplt. ¶¶ 27, 29, 30.) Shain's argument misses the point. *Pinter* requires *both* (1) solicitation and (2) that such solicitation be for financial gain. *See Pinter,* 486 U.S. at 647, 108 S.Ct. at 2078 ("liability extends only to the person who [1] *successfully solicits the purchase,* [2] motivated at least in part by a desire to serve his own financial interests or those of the securities owner.") (emphasis added). Thus, whether financial

gain motivated Duff & Phelps is irrelevant unless plaintiff can allege that Duff & Phelps "solicited" plaintiff's purchase. As discussed above, Shain has not satisfied that hurdle. *See Sellin v. Rx Plus, Inc.,* 730 F.Supp. at 1292–93 (while fact issues exist as to whether defendant acted from financial motive, that does not prevent the Court from granting summary judgment to defendant where undisputed evidence is that defendant "had no role in the solicitation of plaintiff purchaser").

Plaintiff Shain has failed to plead any instance of direct contact between himself and Duff & Phelps (a fact that plaintiff clearly would know), and in fact concedes that Duff & Phelps' only contact with plaintiff (or the purported class) was indirect, through the Class Brokers. Therefore, as a matter of law Duff & Phelps is not a "statutory seller." Accordingly, I recommend that the Court dismiss plaintiff's § 12(1) and 12(2) claims with prejudice.[3]

## II. *PLAINTIFF'S PENDENT STATE LAW CLAIMS SHOULD BE DISMISSED WITHOUT PREJUDICE*

Duff & Phelps also moves for dismissal of plaintiffs' pendent state law claims of (1) negligent misrepresentation (Count III), (2) the Illinois Consumer Fraud Act (Count IV), and (3) the Illinois and other state Blue Sky laws (Count V).

■■■ A district court may exercise pendent jurisdiction over state law claims "whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' " *Carnegie–Mellon Univ. v. Cohill,* 484 U.S.

3. Because of this recommendation, I do not reach any of Duff & Phelps' other challenges to plaintiff's securities claims, including the argument that the recent Supreme Court decision in *Gustafson v. Alloyd Co.,* —— U.S. ——, ——, 115 S.Ct. 1061, 1071, 131 L.Ed.2d 1 (1995), limits § 12(2) liability to public offerings. (The language of § 12(1), in contrast, clearly applies to the offer of unregistered securities that should have been registered.) Shain responds, *inter alia,* that *Gustafson* does not preclude Shain's § 12(2) claim since the complaint alleges that the

"private" offering was required to be registered. (Cplt. ¶ 44.) Dicta in a recent decision supports Shain's argument, but I need not reach this issue. *See, ESI Montgomery County, Inc. v. Montenay Int'l Corp.,* 899 F.Supp. 1061 (S.D.N.Y. 1995) (court dismissed § 12(2) case involving "private offering memoranda" but noted that "[h]ad plaintiff alleged that the offering was public it would be premature for the court to assess the weight of these factors [i.e. factors determining whether offering public] and determine the truth of plaintiff's assertion.").

343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (*quoting United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). The decision whether to exercise pendent jurisdiction, however, is within the discretion of the district court, which should consider such factors as "judicial economy, convenience, fairness and comity." *Carnegie–Mellon v. Cohill,* 484 U.S. at 349–50, 108 S.Ct. at 618–19; *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir. 1993).

When the federal claims are dismissed before trial, the Supreme Court has stated that the district court ordinarily should decline the exercise of jurisdiction by dismissing the state claims without prejudice. *Carnegie–Mellon,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7 ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 ("if the federal claims are dismissed before trial ... the state claims should be dismissed as well.").

Thus, I recommend that, in the exercise of its discretion, the Court dismiss plaintiffs' pendent state law claims without prejudice.

## CONCLUSION

For the reasons set forth above, I recommend that the Court dismiss the complaint's federal securities law claims with prejudice and the state law claims without prejudice.

### *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Whitman Knapp, 40 Centre Street, Room 1201, and to the chambers of the undersigned, 40 Centre Street, Room 540. Any requests for an extension of time for filing objections must be directed to Judge Knapp. Failure to file objections may result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

### *SERVICE OF THIS REPORT & RECOMMENDATION*

A copy of this Report & Recommendation is being mailed to plaintiff's counsel and counsel for defendant Duff & Phelps. A copy also is being mailed to plaintiffs' liaison counsel and defendants' liaison counsel in *In re Towers,* 93 Civ. 0810, 1995 WL 571888, who are to serve it on all other counsel for plaintiffs and defendants, respectively, in that action.

Dated: New York, New York, December 12, 1995